UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

WALESWKA PEREZ, AS THE PERSONAL
REPRESENTATIVE OF THE ESTATE OF RAFAEL
ACOSTA AREVALO; LUIS LUGO
CALDERON; LUIS DE LA SOTTA
QUIROGA; and EDUARDO FIGUEROA
MARCHENA,

     *Plaintiffs,*

v.

NICOLAS MADURO MOROS,
VLADIMIR PADRINO LOPEZ, MAIKEL
MORENO PEREZ, NESTOR REVEROL
TORRES, MANUEL RICARDO
CRISTOPHER FIGUERA, FUERZAS
ARMADAS REVOLUCIONARIAS DE
COLOMBIA, and CARTEL DE LOS SOLES,

     *Defendants.*

Case No.

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs, Waleswka Perez ("Perez"), in her capacity as personal representative for the

Estate of Rafael Acosta Arevalo ("Arevalo"), Luis Lugo Calderon ("Calderon"), Luis de la Sotta

Quiroga ("Quiroga"), and Eduardo Figueroa Marchena ("Marchena"), (collectively referred to as

"Plaintiffs") allege as follows:

## I.    INTRODUCTION AND PRELIMINARY STATEMENT

1.    This is an action for compensatory and punitive damages for torts committed in

violation of international norms and against basic human rights arising out of a narco-terrorist

conspiracy. Plaintiffs seek damages for years of torture; crimes against humanity; cruel, inhuman

and degrading treatment and punishment; arbitrary detention; and the extrajudicial killing of

Arevalo under both United States and Venezuelan law. Plaintiffs also seek damages for violations of the United States Racketeering Influenced and Corrupt Organizations Act ("RICO").

2.       The ruling regime of Nicholas Maduro Moros ("Maduro") in the Bolivarian Republic of Venezuela ("Venezuela") in conspiracy with *Cartel de los Soles*, also known as the Cartel of the Suns ("COS"), and through its Anti-Coup Commandos ("ACC") and National Anti-Coup Command ("NACC"), and, used official government agencies such as *Direccion General de Contrainteligencia Militar* ("DGCIM") and the *Servicio Bolivariano de Inteligencia Nacional* ("SEBIN") to unlawfully target Arevalo, Calderon, Quiroga, and Marchena for arrest, detention, torture, and other cruel, inhuman, and degrading treatment due to their real and/or perceived opposition to the Maduro regime.

3.       Through ACC, and its successor, NACC, Maduro and his co-conspirators— including each of the defendants in this case—unlawfully seized control of and wielded every governmental organ of the Venezuelan state, including its national military, law enforcement, and intelligence agencies in a uniquely horrifying, government-supported narco-terrorism conspiracy in which maintaining control over the proceeds of narcotics trafficking became both the object and the *sine qua non* of the conspiracy to keep Maduro in power. Amidst widespread economic disaster in Venezuela, Maduro maintained his despotic rule through a system of patronage derived from the proceeds of a vast criminal enterprise stretching from Latin America to Europe, with a substantial portion of its operations here in the State of Florida (hereinafter the "COS Criminal Enterprise"). Dissent to his rule was a serious threat to this vital system of patronage and, thus, was brutally and systematically silenced through a pattern of attacks, arbitrary detentions, torture, extrajudicial killings, and other cruel, inhuman, and degrading treatment against his perceived political opponents.

4.      As the United Nations has explained: "[a]s the opposition has been debilitated, the executive [branch lead by Maduro] has taken on increasingly expansive powers."  But for Maduro's authoritarian control over Venezuela, he and his co-conspirators would not be able to wield governmental protection to shield them from prosecution for their unlawful activities in both Venezuela and the United States, where Maduro and many of his co-conspirators have been indicted for narcotics trafficking.

5.      Many aspects of the COS Criminal Enterprise predate Maduro's time in power. However, since taking hold of the presidency, Maduro and his co-conspirators have assumed unchecked leadership over the COS, a criminal organization made up of loyal military officers and government officials, working in conjunction with Colombian narco-terrorists, *Fuerzas Armadas Revolucionairias de Colombia* ("FARC"). Under Maduro's leadership, COS seized control over narcotics trafficking revenue to distribute patronage to supporters of the Maduro regime. As Venezuela's economic crisis worsened, the Maduro regime became increasingly dependent on this illicit revenue.

6.      For more than a decade, COS has conspired with FARC to traffic cocaine into the United States and launder the ill-gotten gains through the United States and elsewhere with the ultimate objective of maintaining Maduro's unlawful authoritarian control over Venezuela.

7.      The Maduro regime, by and through NACC and COS, are engaged with FARC in a symbiotic system of criminal patronage used to unlawfully prop up the Maduro government. Specifically, the narco-terrorist conspiracy between FARC and COS permits Maduro and his co-conspirators to obtain and launder the proceeds of narcotics trafficking, which the regime then uses to pay its loyalists. In exchange, Maduro's regime provides FARC with material support, including access to state-controlled corporations and banks, military grade weapons, and logistical support

to cocaine shipments in the form of sensitive intelligence and transportation of narcotics.

8.      To ensure their control over the various military and law enforcement agencies remained absolute, Maduro and his co-conspirators directed the unlawful detention, torture, and in some cases murder of members of the military with real or perceived ties to political opposition. In so doing, the Maduro regime spread fear, obtained coerced false confessions, discredited the opposition, and discouraged disobedience in the Venezuelan Armed Forces. One of the intended benefits of this widespread intimidation was the COS's continued unchallenged control over a large portion of South American narcotics trafficking from Colombia and the associated revenue and patronage which the Maduro regime relies upon to stay in power.

9.      As a 2022 report by the United Nations found: "Venezuela's military and civilian State intelligence agencies function as well-coordinated and effective structures in the implementation of a plan orchestrated at the highest levels of the government to repress dissent through crimes against humanity." In particular, "the Venezuelan State relies on the intelligence services and its agents to repress dissent in the country. In doing so, grave crimes and human rights violations are being committed, including acts of torture and sexual violence."[1]

10.     This suit arises from the detention, torture, and cruel, inhuman, and degrading treatment of four individuals, one of whom died from the torture. Defendants conspired with the Maduro regime, through COS, ACC, and ACC's successor, NACC, to commit cruel and horrific human rights violations. These human rights violations were acts in furtherance of the criminal conspiracy insofar as they were intended to ensure submission within the ranks of the armed forced and populace of Venezuela by spreading fear, punishing political opposition, and, in so doing,

---

[1] *See* Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela Detailed Findings, A/HRC/51/CRP.3, September 20, 2022 (hereinafter "2022 FFM") p. 13, *available at* https://www.ohchr.org/en/hr-bodies/hrc/ffmv/index.

protecting the narcotics trafficking revenue the Maduro regime required to maintain its control over Venezuela.

11.     Under Maduro's influence, the Venezuelan law enforcement, military, and judiciary organs have failed their affirmative legal duties under various statutes and treaties identified elsewhere herein to respect life and prevent and punish torture, extrajudicial killings, and other cruel, inhuman, and degrading treatment. The Venezuelan judiciary directly facilitated these unlawful acts by failing to investigate credible allegations of torture or cruel, inhuman, and degrading treatment. Victims, including Plaintiffs, appeared in court with visible evidence of torture, or stated that they had been tortured, and yet no action was taken to investigate or punish any of the perpetrators for their unlawful conduct.

12.     In each of the cases at bar, Venezuelan military members were accused, without sufficient evidence, of participation in attempts to overthrow the Maduro regime. The torture, extrajudicial killings, and cruel, inhuman, and degrading treatment Plaintiffs complain of in this suit all arose from this same pattern of conduct.

13.     Plaintiffs have all exhausted their available remedies by reporting their mistreatment to the appropriate Venezuelan and international authorities, but none have provided a sufficient remedy for the arbitrary detentions, egregious torture, extrajudicial killing, or the cruel, inhuman, and degrading treatment they suffered. Therefore, without the relief Plaintiffs seek from this Court, their suffering will go without redress.

14.     Lest the relevance of this story be mistakenly consigned to the past, shortly before Plaintiffs' filing of this suit, Maduro and his regime thrust themselves back into the international spotlight by committing blatant election fraud to defeat political opponents. On September 12, 2024, Maduro and sixteen of his cronies were sanctioned by the U.S. Department of the Treasury

"for their repression of the Venezuelan people and denial of their citizens' rights to a free and fair election."

15.     Purportedly to celebrate his supposed victory, Maduro resorted to a millennia-old artifice of a dictator by decreeing October 1 to be "the beginning of Christmas" in the spirit of "peace, joy and security." Not coincidentally, this announcement came several hours after his regime issued an arrest warrant for his main political rival, the legitimate winner of the presidential election.

16.     Unfortunately, these actions clearly demonstrate that, unlike the converted antagonists of classic holiday literature, the villains of this story stubbornly persist in their roles without any signs of remorse or repentance. Because of these architects of atrocity, honest, brave, and patriotic citizens of Venezuela continue to suffer today from the same violent oppression experienced by Arevalo, Calderon, Quiroga, and Marchena. In a plea for justice, Plaintiffs present Maduro and his co-conspirators with this suit as the early Christmas gift that they so richly deserve.

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this case under the Torture Victim Protection Act of 1991 ("TVPA") 28 U.S.C. § 1350, note, § 2(a), and 28 U.S.C. §§ 1331, 1332, 1350, and 1367.

18.     Title 28, United States Code, Section 1350 provides a federal forum for and accords federal jurisdiction to "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." This is a civil action where none of the Plaintiffs are United States citizens. Defendants committed torts in violation of the following treaties of the United States:

(a)     International Covenant on Civil and Political Rights, *adopted* Dec. 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force Mar. 23, 1976) (*ratified by the United States, June 8, 1992).*

(b)    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20 (1988) *reprinted in* 23 I.L.M. 1027 (1984) (entered into force, June 26, 1987).

19.    Defendants also committed torts in violation of the law of nations, as codified in

the following international agreements and declarations:

(a)    Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810, at 71 (1948).

(b)    The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. Res. 2391 (XXIII), Annex, 23 U.N, GAOR, Supp. No. 18, at 40, U.N. Doc. A/7218 (1968).

(c)    The Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, U.N. Doc. A/CONF. 183/9 (1998), reprinted in 37 I.L.M. 999, *signed but not ratified by the United States* (not yet in force).

(d)    Principles of International Co-Operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes Against Humanity, G.A. Res. 3074, U.N. GAOR, 28th Sess., Supp. No. 30A, at 78, U.N. Doc. A/9039/Add.1 (1973).

(e)    Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452 (XXX), U.N. GAOR, 30th Sess., Supp. No. 34, at 91, U.N. Doc. A/10034 (1975).

(f)    United Nations Standard Minimum Rules for the Treatment of Prisoners, U.N. GAOR, 24th Sess., Annex, U.N. Doc. A/CONF/611, Annex I, (1957), approved July 31, 1957, E.S.C. Res. 663(c), 24 U.N. ESCOR, 24th Sess., Supp. No. 1, at 11, U.N. Doc. E/3048 (1957), amended E.S.C. Res. 2076, 62 U.N. ESCOR, 64th Sess., Supp. No. 1, at 35, U.N. Doc. E/5988 (1977).

(g)    American Convention on Human Rights, opened for signature Nov. 22, 1969, O.A.S.T.S. No. 36, at 1, O.A.S. Doc. OEA/Ser.L.V./II.82 (entered into force July 18, 1978).

(h)    American Declaration of Rights and Duties of Man, O.A.S. Res. XXX, O.A.S. Doc. OEA/Ser.L.V/II.82 doc. 6, rev. 1 (1992).

(i)    Inter-American Convention to Prevent and Punish Torture, opened for signature Dec. 9,1985, O.A.S.T.S. No. 67, at 13, O.A.S. Doc. OEA/Ser.A/42 (SEPF) (entered into force Feb. 28, 1987).

20.    Asserting jurisdiction is also appropriate here because it is the express policy of the

United States not to provide safe harbor for individual perpetrators of human rights abuses when

they are found present in the United States. *See* Br. of the United States in *Kiobel* at 5; *see also*

United States Statement of Interest in *Ahmed v. Magan*, No. 2:11-cv-00342 (Dkt. 45) at ¶ 9 (Persons in the United States "ordinarily should be subject to the jurisdiction of our courts").

21.     Claims in this Complaint also touch and concern the territory of the United States because the underlying conduct was part of a scheme to unlawfully traffic drugs into the United States in exchange for funds used to pay the military and law enforcement units Maduro has used to stay in power by carrying out human rights abuses such as those alleged herein. These actions represent criminal activity against which the United States has taken prosecutorial action.

22.     Holding individual perpetrators accountable in civil court "is consistent with the foreign relations interests of the United States, including the promotion of respect for human rights." *See* Br. of the United States in *Kiobel* at 19.

23.     This Court has personal jurisdiction over Defendants under the Florida long-arm statute, consistent with the Due Process Clause of the U.S. Constitution, because they, personally and/or through agents, unincorporated associations, and/or co-conspirators, committed tortious and criminal acts within the State of Florida that provided the funding, resources, and political power necessary to commit the acts giving rise to Plaintiffs' claims. Such tortious and criminal acts were purposefully targeted at the United States, primarily concentrated in the State of Florida, and executed for the express purpose of exerting political control and perpetrating human rights violations in Venezuela, such as those at issue in this case.

24.     This Court has personal jurisdiction over Defendants to the extent that they reside in this District and/or are served here.

25.     For those Defendants who do not reside within the United States, this Court has personal jurisdiction pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure. The claims alleged herein arise under federal law, those Defendants are not subject to the jurisdiction of any state court, and the exercise of federal jurisdiction over Defendants is consistent with the Constitution and laws of the United States. Defendants conspired to purposefully direct massive drug trafficking activities into the United States, including the Southern District of Florida, and the injuries alleged herein arose out of the combination of funding and political power cultivated

through that long-standing drug trafficking conspiracy.

26. The United States District Court for the Southern District of Florida is a proper venue for this action pursuant to 28 U.S.C. § 1391. Defendants conspired to put into action a drug trafficking enterprise that resulted in substantial volumes of illegal narcotics passing through this District and producing revenue that was then returned to Venezuela to support the illegal acts alleged herein.

27. For instance, numerous cartel operatives have been indicted in this district for their unlawful narcotics trafficking activities *See United States v. Luis Martin-Olivares*, No. 15-cr-20299 (S.D.Fla); *see also United States v. McTurk-Mora,* No. 13-cr-20930 (S.D. Fla.); *United States v. Itriago,* No. 13-cr-20050 (S.D. Fla.).

28. In addition to raising funds for terrorist acts through narcotics trafficking activities in the State of Florida, members of the COS Criminal Enterprise have also been indicted in this District for conducting extensive money laundering activities within the State of Florida *See United States v. Luis Alfredo Motta Dominguez,* 19-cr-20388; *see also United States v. Francisco Convit Gurceaga, et. at.* 18-MJ-03119; *and United States v. Maikel Moreno Perez*, 23-20035-CR. But for their ability to dole out patronage to their supporters and agents in the NACC from the illicit criminal proceeds they laundered through the State of Florida, the COS and its co-conspirators in the Maduro regime would not have had the means to immunize themselves from prosecution or ouster from power for their unlawful acts and oppressive treatment of these Plaintiffs and the people of Venezuela.

## III.   UNITED STATES CONCERN IN THE CASE

29. The wrongful conduct alleged herein was committed as part of the conspiracy by the Maduro regime, in concert with COS and FARC, to utilize proceeds derived from unlawful narcotics trafficking to generate revenue for the Maduro regime to pay the military and law enforcement agents it needs to stay in power. In order to maintain control over the proceeds of this unlawful criminal enterprise, Maduro created the ACC and its successor, the NACC to spread a culture of fear to dissuade opposition activities against his regime through a campaign of torture,

cruel, inhuman, and degrading treatment, and extrajudicial killing, including those acts alleged herein.

30.     The United States has sanctioned the Maduro regime, and a large number of Venezuelan government officials, in connection with human rights abuses and anti-democratic activity.

31.     The United States has successfully sought extradition for individuals charged with exploiting the authority of Venezuela's government and military to corrupt Venezuelan institutions, abuse the Venezuelan people, and to import cocaine to the United States.

32.     According to the Department of Justice, law enforcement has seized upwards of $450 million dollars' worth of property in South Florida related to the COS Criminal Enterprise.

33.     Several individual defendants have been indicted by federal grand juries in prosecutions brought by the United States Department of Justice for their part in the narco-terrorist conspiracy between the COS and FARC. Some are in custody, while others will likely remain fugitives from justice.

34.     Together, Defendants have conspired to render the Venezuelan justice system a tool of their will and routinely mete out severe reprisals for those who oppose them. Plaintiffs' legal options against the Defendants in Venezuela are effectively foreclosed, leaving the United States as the only forum to obtain a remedy.

## IV.     PARTIES

35.     Plaintiff Perez is Arevalo's widow. She has asylum in the United States and currently resides in the State of Texas. Perez is the personal representative of Arevalo's Estate and brings this suit in that capacity. Arevalo was killed, on June 28, 2019, as a result of torture he suffered while in DGCIM custody. At the time of his death, Arevalo was 50 years old. He was a resident and citizen of Venezuela and a Captain in the armed forces of Venezuela ("FANB").

36.     Plaintiff Calderon is a resident of the State of New Jersey. He was at all times relevant to this case a citizen of Venezuela and a First Lieutenant in the Venezuelan Air Force. In February of 2015, Calderon was arrested and falsely accused of participating in a coup plot to

violently overthrow the Maduro regime. Thereafter, he was detained, tortured, interrogated, and subjected to serious injury and other cruel, inhuman, and degrading treatment. Calderon was denied his right to a fair trial and unlawfully imprisoned over a period of more than five years.

37.     Plaintiff Quiroga is a resident of the State of Georgia. He was, at all times relevant to this case, a citizen of Venezuela and a Second Commander of the Eighth Marine Command Brigade, Special Operations Unit of the Venezuelan Navy. He was arrested by DGCIM and falsely accused of participating in a coup against Maduro called Operation Armageddon. Quiroga was unlawfully detained for more than five years, and subjected to torture and other cruel, inhuman, and degrading treatment intended to punish him for his perceived political opposition and to coerce him into falsely confessing to unlawful activity and implicate others in the same.

38.     Plaintiff Marchena is a resident of Spain. He was, at all times relevant to this case, a citizen of Venezuela and a lieutenant in the Venezuelan Air Force. Marchena was imprisoned for fifteen months in the basement of DGCIM Boleita where he was subjected to torture and other cruel, inhuman, and degrading treatment. Marchena was then transferred to Ramo Verde prison where he served a sentence of three years and nine months and was further subjected to torture and other cruel, inhuman, and degrading treatment intended to punish his perceived opposition to the Maduro regime.

39.     Defendant COS is a Venezuelan drug-trafficking organization controlled by Maduro and several others. It is an unincorporated criminal association based in Venezuela that acts by and through its individual members. According to the United States Department of Justice, COS and its leaders "expressly intended to flood the United States with cocaine in order to undermine the health and wellbeing of our nation."[2] Several senior members of COS are incarcerated in the U.S., including (Former) Major General Cliver Alcala Cordones, who is charged with conspiracy to commit narco-terrorism, conspiracy to import cocaine, and associated firearms charges.

---

[2] *See* Press Release, U.S. Dep't of Justice, Nicolas Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking, and Other Criminal Charges § 3 (March 26, 2020), *available at* https://www.justice.gov/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco-terrorism.

40.     Defendant FARC is a terrorist organization which became, between 1999 and 2021, one of the largest producers of cocaine in the world. In connection with its narco-terrorist activities, FARC has consistently perpetrated acts of violence against U.S. nationals and property. The United States designated FARC as a Foreign Terrorism Organization from October 8, 1997 until December 1, 2021. Although it was nominally disbanded by a 2016 Peace Accord with the Colombian government, FARC lives on to this day via splinter groups such as the Revolutionary Armed Forces of Colombia – People's Army, and Segunda Marquetalia, who are themselves designated terrorist organizations. FARC is an unincorporated criminal association based in Colombia that acts by and through its individual members, with operations throughout South America, Central America, and the United States. Certain senior leaders, such as Juvenal Ovidio Ricardo Palmera Pineda, are imprisoned in the United States.

41.     Defendant Maduro, the President of Venezuela, was born on November 23, 1962, in Caracas, Venezuela. On July 31, 2017, the U.S. Department of Treasury, Office of Foreign Asset Control ("OFAC") sanctioned Maduro for undermining democracy in Venezuela. On March 26, 2020, the Department of Justice indicted Maduro for orchestrating a "corrupt and violent narco-terrorism conspiracy between the Venezuelan [COS] and [FARC]." He has directed and/or coordinated a large volume of acts in furtherance of the COS Criminal Enterprise within the Southern District of Florida. Maduro is a citizen and resident of Venezuela where he openly, notoriously, and unlawfully controls the country and remains a fugitive from justice.

42.     Defendant Vladimir Padrino López ("Padrino Lopez") was born on May 30, 1963 in Caracas, Venezuela and is the *de facto* Minister of Defense of Venezuela. On September 25, 2018, OFAC imposed sanctions on Padrino Lopez, identifying him as a "member of [Maduro's] inner circle and lifelong member of the Venezuelan military" who Maduro appointed to "help ensure the military's loyalty to the Maduro regime."[3] Padrino Lopez was indicted in the United States District

---

[3] *See* Press Release, U.S. Dep't of the Treasury, Treasury Targets Venezuela President Maduro's Inner Circle and Proceeds of Corruption in the United States (Sept 25, 2018), *available at* https://home.treasury.gov/news/press-releases/sm495.

Court for the District of Columbia. The indictment alleges that from March 2014 until May 2019, Padrino Lopez conspired with others to distribute cocaine on board an aircraft registered in the United States. He knowingly joined, furthered, and/or directed acts undertaken by the COS Criminal Enterprise that occurred within the State of Florida. Padrino Lopez is a senior member of the COS and the NACC and is a citizen and resident of Venezuela, where he remains a fugitive from justice.

43.     Defendant Maikel Moreno Perez ("Moreno") was born on December 12, 1965 in El Tigre, Anzoátegui, Venezuela. In May 2017, OFAC sanctioned Moreno for "judicial rulings . . . that have usurped the authority of Venezuela's democratically-elected legislature."[4] He has also been criminally charged in this district as with conspiracy to commit money laundering in the State of Florida and money laundering in connection with the corrupt receipt of millions of dollars and bribes to illegally alter the outcome of dozens of civil and criminal cases in Venezuela. In furtherance of the COS Criminal Enterprise, Moreno spent and received larger sums of money within this District. Moreno has been the President of the Supreme Tribunal of Justice of Venezuela since February 24, 2017. Under Moreno's leadership, courts subordinate to this tribunal have abandoned the rule of law and wielded judges loyal to Maduro to carry out the will of his regime. Judges under the influence of Moreno and the NACC have violated due process, ignored credible allegations of torture and human rights violations, and imprisoned individuals on the mere basis of real or perceived ties to political opposition. Judges who refused to carry out the will of Maduro, Moreno, and COS were imprisoned and threatened with death, creating a climate of terror for judges and prosecutors who feared retaliation for complying with the law.[5] Moreno is a citizen and resident of Venezuela and a fugitive from justice.

44.     Defendant, Nestor Reverol Torres ("Torres") was born on October 28, 1964 in

---

[4] *See* Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice (May 18, 2017), § 1, *available at* https://home.treasury.gov/news/press-releases/sm0090.

[5] *See* 2020 FFM p. 39–43; *see also* 2018 OAS Report p. 199–203 (citing testimony from a former prosecutor, judge, and former Attorney General as "proof of a judicial system that has been completely coopted by the Executive . . . to falsely prosecute opposition leaders, or anyone. . . at odds with the Government").

Maracaibo in the State of Zulia, Venezuela. Torres is the former general director of Venezuela's government agency charged with fighting narcotics production and trafficking. Torres is a senior member of COS. In 2016, a Brooklyn federal grand jury indicted Torres for offenses including trafficking and distributing cocaine. He was directly involved in the transportation of narcotics into the United States, including the State of Florida. On July 26, 2017, OFAC imposed sanctions on Torres for "undermining democracy in Venezuela."[6] He is a citizen of Venezuela and a fugitive from justice.

45.     Defendant Manuel Ricardo Cristopher Figuera ("Figuera") is a Venezuelan citizen born on November 8, 1963, in Punta de Mata, Monagas, Venezuela. From 2014 until October 2018, Figuera was the Deputy Director of DGCIM. Between October 2018 and April 2019, Figuera served as Director of SEBIN. During his tenure, SEBIN received and executed unlawful orders from Maduro and others as to who to detain, who to torture, and who to release. Despite personal awareness that widespread torture was occurring, he faithfully carried out orders to facilitate the acts of arbitrary detention, torture, and extrajudicial killing alleged herein. Figuera currently resides in the United States, upon information and belief in the State of Florida, after defecting from the Maduro regime.

## V.     NON-PARTY CO-CONSPIRATORS

46.     Hugo Armando Carvajal-Barrios ("Carvajal") was born on April 1, 1960, in Puerto La Cruz, Venezuela. Carvajal was the former director of DGCIM and a senior member of COS. He, along with Maduro and Diosdado Cabello, was one of the primary authors of the narco-terrorism conspiracy between COS and FARC. In that role, Carvajal conspired with FARC to transport and distribute large cocaine shipments into the U.S. and elsewhere. His activities caused large quantities of previously seized cocaine to be sold to drug traffickers in exchange for millions of dollars. He also interfered with drug-trafficking investigations and pending criminal cases in

---

[6] *See* Press Release, U.S. Dep't of Treasury, Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela, ¶ 1 (July 26, 2017) ("July 26, 2017 OFAC Press Release") *available at* https://home.treasury.gov/news/press-releases/sm0132.

Venezuela and provided FARC with military-grade weapons. Carvajal was indicted for conspiracy to commit narco-terrorism, conspiracy to import cocaine, and associated firearms charges.[7] Carvajal's contributions to the COS Criminal Enterprise resulted in substantial unlawful narcotics trafficking and the laundering of its proceeds throughout this district. Carvajal is currently in United States custody.

47.     Diosdado Cabello Rondón ("Cabello") is a Venezuelan citizen born on April 15, 1963, in El Furrial, Monogas State, Venezuela. He currently resides in Venezuela and was appointed in August 2024 as the Minister of Internal Affairs, Justice and Peace, the agency overseeing the national police forces. Cabello was the President of Venezuela's illegitimate National Constituent Assembly from June 2018 until December 2020. Cabello has served as the longtime Vice-President of the United Socialist Party of Venezuela and an officer in the Venezuelan Army, reaching the rank of Captain. Cabello was responsible for giving orders to torture or kill specific individuals who opposed the Maduro regime directly to organs of Venezuela's intelligence services, including SEBIN and DGCIM, and those orders were then disbursed to other directorates. Cabello is a senior member of COS and served as the chairman of ACC and a member of its successor, NACC. In a recent public address regarding several political opponents following Maduro's supposed electoral victory, Cabello said "[t]hey're hiding like rats but we're going to grab them."

48.     Major General Gustavo Enrique Gonzalez Lopez ("Lopez") was born on November 2, 1960 in Miranda, Venezuela. He became the Director of SEBIN on February 17, 2014, left the post on October 31, 2018, only to return in April 2019. Under Lopez's leadership, SEBIN facilities have participated in widespread and well documented incidents of arbitrary detention, torture, extrajudicial killing, and other cruel inhuman and degrading treatment of opponents to the Maduro regime and have also provided intelligence to such operations by assisting with the selection of targets. Lopez previously served as the Minister of Interior, Justice and Peace from March 10,

---

[7] *See* U.S. Department of State, Wanted: Narcotics Rewards Program Targets – Hugo Armando Carvajal Barrios – New Target March 26, 2020, *available at* https://2017-2021.state.gov/hugo-armando-carvajal-barrios-new-target.

2015 until August 3, 2016. In 2017, he was promoted to General-in-Chief of the military. Gonzales Lopez is also a member of NACC.

49.     Ivan Rafael Hernandez Dala ("Dala") was born on May 18, 1966 in Caracas, Venezuela and currently resides in Venezuela. In January 2014, Maduro appointed Dala as commander of DGCIM. Upon information and belief, at the time of the incidents alleged herein, Dala was in command of DGCIM and each of the facilities named herein at which Plaintiffs suffered torture, extrajudicial killings, and other cruel, inhuman, and degrading treatment. Dala, along with Defendant Figuera, was present during at least one interrogation in which a victim alleged he had been tortured. Despite Dala's personal awareness that widespread torture was occurring, he took no concrete actions to prevent or punish the perpetrators of torture under his command.

50.     Rafael Antonio Franco Quintero ("Quintero") was born on October 14, 1973, and currently resides in Venezuela. Qunitero was the director of Special Directorate of Criminal and Criminalistics Investigations (DEIPC), a division of DGCIM, from November 2016 until November of 2018. He was first brought into DGCIM by former DGCIM Director Hugo Carvajal before 2013. During his time as director of DEIPC, he held the rank of Colonel directly under DGCIM's Deputy General Director and General Director. As director of DEIPC, Quintero led investigations against intelligence targets and alleged military dissidents. Since 2014, Quintero received orders directly from General Director Dala and gave orders to subordinates to carry out torture and other forms of ill treatment. Quintero maintained an office in the basement so he could follow developments on the floor where detention cells used for torture were located. Under his leadership, the frequency and intensity of torture conducted in DGCIM facilities increased substantially, and Quintero took part personally. Quintero ordered the investigation, wrongful arrest, and detention of Quiroga on May 18, 2018, and was responsible for the torture and cruel and inhuman treatment suffered by Marchena between 2016 and 2019. Rather than being punished for his open and notorious conduct, Maduro promoted Quintero to Brigadier General in 2020.

51.     Upon information and belief, Carlos Enrique Teran-Hurtado ("Teran-Hurtado") currently resides in Venezuela. Teran-Hurtado was the DGCIM officer responsible for the

detention facilities at DGCIM Boleita where Quiroga was unlawfully detained and tortured.

52.     Nestor Neptali Blanco-Hurtado ("Blanco-Hurtado") was born on September 26, 1982 and currently resides in Venezuela. Blanco-Hurtado is a Major in FANB currently assigned to DGCIM. Blanco-Hurtado was directly involved in the beating and torture of Quiroga while he was detained at DCGIM Boleita.

## VI.   STATEMENT OF FACTS

### A.     The Maduro Regime's Narco-Terrorist Conspiracy with COS Captures Illicit Revenue Streams from Narcotics Trafficking in Florida to Feed Maduro's Terror and Repression in Venezuela.

53.     Venezuela has suffered from pervasive lawlessness and repression since the rule of President Hugo Chavez. Key leaders of Venezuela's ruling party, *Partido Socialista Unido de Venezuela* ("PSUV"), have conspired to maintain power indefinitely regardless of electoral legitimacy.

54.     Since 2013, Maduro, a longtime member of the PSUV, has been president of Venezuela and commander-in-chief of its armed forces.

55.     After rising to power, Maduro and his co-conspirators assumed leadership over COS. Working with FARC, these Maduro allies seized control over narcotics trafficking revenue in order to distribute political patronage. As Venezuela's economic crisis worsened, the Maduro regime became increasingly dependent on securing and growing this illicit revenue, an effort that required the ability to maintain control over agents of the Venezuelan military, law enforcement agencies, and the judiciary. Cultivating this illicit revenue stream also required the identification and maintenance of clandestine markets for the sale of unlawful narcotics and the laundering of those proceeds.

56.     At all times relevant to this case, COS has conspired with FARC to traffic cocaine into the United States, including the State of Florida, and launder the associated revenues with the

ultimate objective of maintaining Maduro's unlawful authoritarian control over Venezuela.

57. The Maduro regime, by and through NACC and COS, are engaged with FARC in a symbiotic relationship. Specifically, FARC and COS engage in a narco-terrorist conspiracy allowing Maduro and his co-conspirators to obtain and launder the proceeds of narcotics trafficking, much of which was laundered through the State of Florida and then used to pay patronage to loyalists who carry out other acts in furtherance of the conspiracy, such as those giving rise to the injuries complained of herein.

58. A key player in this symbiotic drug-trafficking relationship was Torres. From his position as the leader of the Maduro regime's drug enforcement agency, he was able to protect, direct, and facilitate the transfer of illegal narcotics out of Venezuela and into the United States. Torres was indicted in the United States for these activities on January 21, 2015.

59. Supported by payments derived from the proceeds of these narco-terrorism activities, Maduro's patronized loyalists, including Padrino Lopez, Moreno, Torres, and Figuera, carried out his will to maintain political control by terrorizing the Venezuelan people to dissuade any political opposition. In turn, Maduro, through COS and NACC, used his control over Venezuela's military, law enforcement agencies, and judiciary to shield his co-conspirators from prosecution for their activities and providing COS and FARC with the support needed to ensure the safe and clandestine delivery of cocaine shipments.

60. The key to the success of COS is fourfold: (1) COS members have utilized their positions as government officials, under color of law, to provide logistical support to FARC's cocaine trafficking operations in the U.S.; (2) COS members maintain control over the proceeds of the cocaine trafficking operation which have replaced oil revenue as the Maduro regime's primary means of financial support; (3) COS members have placed high ranking co-conspirators, like Padrino

Lopez, Torres, and Moreno, in control of military, law enforcement, and judicial agencies which would otherwise be responsible for putting a stop to their unlawful conduct; and (4) COS members maintain a culture of fear to dissuade dissent in the ranks of those same military and law enforcement agencies.

61.     FARC's conspiracy with COS to traffic cocaine is the *sine qua non* without which the Maduro regime would not have the funding to dole out the patronage it uses to stay in power and continue to commit human rights abuses such as those alleged herein.

62.     As shown by the indictments in the cases of Pedro Luis Martin-Olivares, Rodolfo McTurk-Mora, and Jesus Alfredo Itriago, from as early as 2000 and continuing through at least 2010, corrupt officials within the Venezuelan government acting on behalf of COS have distributed cocaine into the State of Florida, and elsewhere in the United States, and have impeded the investigation thereof.

63.     In addition to narcotics trafficking, as shown by U.S. indictments against officials of Venezuela's national oil company, the Petroleos de Venezuela, S.A. ("PDVSA")—including Moreno—COS has conducted extensive money laundering activities within this District as recently as August 2018. According to OFAC, the PDVSA is the Maduro regime's primary conduit for corruption. In the process, it has become so indistinguishable from COS that Courts of this District have recognized PDVSA as an instrumentality of COS. *See Osio v. Maduro*, Case No. 1:21cv20706, ECF No. 110 at 7.

64.     In March 2020, the U.S. Department of State offered a reward of up to ten million dollars for information leading to the arrest of Cabello or Carvajal, and fifteen million dollars for information regarding Maduro. Therein, Cabello, Carvajal, and Maduro are identified as personally coordinating exchanges of cocaine and weapons between COS and FARC, as well as paving the way

for the international distribution of cocaine into, among other locations, the United States.

**B.     The Maduro Regime Deployed Plan Zamora to Maintain Control Over the COS Criminal Enterprise by Crushing Dissent in Venezuela through Widespread and Systematic Attacks Against Its Civilian Opposition.**

65.     Since the earliest days of their involvement in the COS Criminal Enterprise, Maduro, Cabello, Carvajal, and their co-conspirators have been concerned that instability in Venezuela could disrupt their control over the proceeds of narcotics trafficking. During a 2009 meeting with a FARC representative regarding a four-ton cocaine shipment, Maduro, Cabello, and Carvajal discussed a recent *coup d'etat* in Honduras which Cabello warned could result in instability which could "fuck up the business."[8]

66.     In January 2014, economic decline, inflation, and social insecurity combined to create widespread strife and instability in Venezuela. In response, a group of opposition leaders initiated a campaign to remove President Maduro from office. The effort was referred to as *La Salida*: "the Exit." Had *La Salida* succeeded in wresting power from Maduro and his co-conspirators, the conditions under which they continued to enjoy the patronage of the COS Criminal Enterprise with impunity from criminal prosecution would have likely ceased to exist.

67.     Students in the state of Tachira were the first to organize protests in support of *La Salida* and the Maduro regime responded by arresting and detaining the students, causing solidarity protests to spread all around the country.

68.     On February 12, 2014, three people were shot and killed during protests. That same day, Maduro accused the opposition of inciting chaos and violence and prohibited "unauthorized protests." Maduro also created ACC to "continue defeating the fascist coup in Venezuela." Shortly thereafter, the opposition leader who called for the protests was arrested.

69.      The ACC was assembled by Maduro from members of the armed forces and civilian groups for the purpose of preparing a "zone by zone" and "name by name" plan to prevent

---

[8] *See* Superseding Indictment at 12, ¶ 15(h) *United States v. Maduro Moros*, No. 1:11-cr-205.

a coup.[9]

70.     In December 2014, following a sharp global fall in oil prices, Venezuela's economy deteriorated even more rapidly. By December 2015, a collation of opposition parties had won two-thirds of the seats in the elections for Venezuela's national legislature, the National Assembly. Before the newly elected legislators took office in January 2016, the outgoing National Assembly quickly selected 13 judges and 21 alternates to the Supreme Court, all of whom were loyal to Maduro.

71.     In 2015, by Presidential Decree No. 1605, Maduro gave DGCIM, then led by his co-conspirator, Dala, broad powers to "conduct, coordinate, and execute activities aimed at the discovery, prevention and shutdown of enemy activity." Maduro also tasked Dala's DGCIM to "prevent and cut off the intelligence, counterintelligence, and subversive activities of enemies acting against the Bolivarian National Armed Forces."

72.     Between March of 2014 and February of 2015, several senior military officers, mostly from the aviation sector, were accused of a conspiracy to violently overthrow the Maduro regime. In one particular case, which Maduro called "Golpe Azul", military officers were accused of an alleged plan to attack his residence, Miraflores Palace.

73.     Cabello, from his prominent position as the president of the illegitimate National Constituent Assembly, widely disseminated the regime's false and misleading allegations about Golpe Azul on his television program, *Con Al Mazo Dando*.[10] Despite the widespread and public

---

[9] *See* 2020 FFM p. 16 (citing to video files on YouTube which are no longer available to the public because the accounts that posted them were terminated); *see also* 2014 Annual Report of the Inter-American Commission on Human Rights (IACHR), ¶ 353 (links to videos that remain available in which Maduro makes these statements in his own words).

[10] *See* 2020 FFM p. 71, (citing YouTube Video, teleSURtv. Diosdado Cabello difunde pruebas sobre intento de Golpe en Venezuela, 13 February 2015, *available at* https://www.youtube.com/watch?v=7mZIaTmUr4o; YouTube Video, Últimas Noticias, Nombres

circulation of these claims, the regime never substantiated them by offering evidence at the trial of any of the accused.

74.      Plaintiffs Calderon and Marchena were among those officers arrested because of these allegations. Thereafter, Calderon and Marchena suffered torture, cruel, inhuman, and degrading treatment while detained in facilities controlled by SEBIN and DGCIM. Both before and after their detention, Cabello made specific reference to Plaintiffs Calderon and Figueroa on *Con Al Mazo Dando*, including highly specific, albeit misleading, materials about their cases, including audio recordings of coerced confessions provided to him by agents of DGCIM and SEBIN. Circulating these misleading accounts was intended to benefit the COS by discrediting opposition to the Maduro regime and demoralizing its many opponents.

75.      Throughout 2016, at Maduro's direction, the Supreme Court consistently declared laws passed by the new National Assembly unconstitutional. Between December 2015 and August 2016, the Supreme Court made several rulings alleging irregularities and contesting the legitimacy of several officials. The Supreme Court's rulings effectively reduced the opposition's two-thirds majority to a simple majority.

76.      In March 2016, the opposition advanced a referendum to recall Maduro in accordance with the procedural steps required by Venezuelan law. Hundreds of thousands of Venezuelans participated in protests demanding that the referendum proceed. The Maduro regime responded by suspending the recall process. The National Assembly responded in turn by announcing they would impeach Maduro.

77.      In defiance of the Supreme Court, the duly elected National Assembly swore in the contested officials. On September 2, 2016, in an effort to eliminate political opposition, the Supreme Court, then led by Moreno, held the National Assembly in contempt and declared all its

---

de los militares involucrados en la "Operación Jericó", 12 February 2015, *available at* https://www.youtube.com/watch?v=RqxUh12Ctus).

acts were "manifestly unconstitutional and absolute null and lacking all validity and legal effect." Following that holding, the powers of the legislature were progressively limited and executive powers broadened through a series of presidential decrees declaring a "state of exception and economic emergency." The Moreno-led Supreme Court ruled these measures constitutional and held that the National Assembly was powerless to legislate in any matter covered by the state of exception which was now reserved to Maduro.

78.     In January 2017, also in response to real or perceived opposition to his authoritarian control over Venezuela, Maduro formed the NACC; an organization of high-ranking PSUV members loyal to him. Maduro's stated purpose for the NACC was "persecuting, attacking, and intimidating the internal enemy."[11]

79.     In March 2017, the Maduro-controlled, Moreno-led Supreme Court escalated the crisis by issuing two judgments that disrupted Venezuela's constitutional order. The first ordered that Maduro to take broad "civil, economic, military, criminal, administrative, political, legal, and social measures" to ensure governability in the country. The Supreme Court also called the acts of the National Assembly "treason." The following day, the Supreme Court assumed the legislative powers of the National Assembly. The Court's actions enraged the people of Venezuela, sparking thousands of protests throughout the country.

80.     In April 2017, defendant Padrino Lopez, Venezuela's Minister of Defense and a member of the NACC, developed "Plan Zamora" with the objective of maintaining "internal order" in the country.[12] Padrino Lopez also issued Resolution No. 008610, an unlawful standing order authorizing the use of deadly force by security forces against protestors.

81.     On April 19, 2017, in response to escalating protests, Maduro announced the activation of the "green phase" of Plan Zamora with the objective of maintaining "internal order."

---

[11] *See* 2018 OAS Report p. 50 (citing to video files which were widely broadcasted by Venezuelan and Latin American media outlets where President Maduro describes the purpose of the NACC).

[12] *See* 2020 FFM p. 296.

He described the plan as a "joint civil-military" operation, involving military, police, and civilian forces to "defeat the coup d'état," which he claimed was planned by the United States. On May 1, 2017, Maduro also enacted a decree creating the "National Constituent Assembly;" an illegitimate legislative body formed with the objective of transforming the state, creating a new legal system, and rewriting the constitution.

82.     At this same time, Torres, acting as the Interior Minister, supported the regime's campaign of arbitrary detentions, torture, and extrajudicial killings of political opponents through his ability to wield the power of the Bolivarian National Police forces. Despite widespread human rights abuses under his command, Torres continued to be promoted and elevated by Maduro.

83.     Amidst this ongoing strife, the Venezuelan Observatory for Social Conflict documented 9,787 protests, with the highest number occurring between April 1 and July 31, 2017. In June of 2017, Maduro responded via a televised statement: "We will go into combat. We will never surrender. What could not be done with votes, we will do with arms. We will liberate our nation with arms." Between 2017 and the present, Maduro and his NACC carried out his threats by wielding Plan Zamora to kill and torture hundreds of Venezuelans.

84.     January 2018 represented an escalation point in the conflict between Maduro and his political opposition. The Supreme Court issued a ruling that the opposition coalition could not participate in the upcoming elections, causing calls for a boycott of the 2018 elections. Many neighboring nations spoke out against the elections, alleging that measures were not in place to ensure they were free, transparent, and democratic. These calls went unanswered, and Maduro was unlawfully elected to a second six-year term on May 20, 2018.

85.     On May 16, 2018, DGCIM circulated an intelligence report alleging that commanders from Special Forces units were planning a coup to prevent Maduro's re-election. DGCIM then arrested 30 military officers for allegedly conspiring against the Maduro regime. Just as with earlier incidents, Cabello went on television and falsely claimed that the arrested

individuals were part of a coup termed "Operation Armageddon."

86.     Plaintiff Quiroga, was among the military officers arrested in May 2018. He, along with many other officers, suffered torture and cruel, inhuman, and degrading treatment while detained at DGCIM headquarters Boleita in Caracas.

87.     Similarly, in June of 2019, Arevalo was arrested and accused of involvement in yet another coup plot, this time named "Vuelvan Caras." On June 27, 2019, Cabello also referenced Arevalo's detention on his television program. While in detention, Arevalo was subjected to torture and other cruel, inhuman, and degrading treatment which was so severe as to cause his death.

88.     These cases illustrate a wider pattern of unlawful conduct in which DGCIM agents arrive, threaten a target with weapons, and refuse to present an arrest warrant or tell the target what they have been accused of. Once detained, the targets are refused access or communication with family members or legal counsel. The targets are then interrogated and subjected to torture or other cruel, inhuman, or degrading treatment in order to induce a confession that they were involved in a plot to overthrow Maduro or engage in other opposition activity.

89.     Following their torture, regime targets were often presented before the Military Courts of Control with visible evidence of torture which goes without any medical evaluation or investigation into the conditions of their detention. Targets are also often denied counsel of their choice and returned to the very same facilities that tortured or mistreated them. During these proceedings, the only evidence presented is typically from confessions given by others arrested in connection with the same incident, who were also tortured themselves.

**C.      *Plaintiffs Endured Unlawful Detention, Brutal Torture, Extrajudicial Killing, and other Cruel, Inhuman, and Degrading Treatment at the Hands of COS and the Maduro Regime.***

90.     The unlawful acts and omissions alleged in the paragraphs that follow were carried out by named and unnamed perpetrators from among Venezuela's armed forces or intelligence services, conspiring and acting in concert with and for the benefit of the Maduro regime, COS, and

the individual Defendants. This common plan, design, and scheme operated to keep the Maduro regime in power by suppressing opposition, spreading fear, and utilizing this environment to maintain control over the COS Criminal Enterprise and the revenue streams derived from its ongoing narco-terrorist operations with FARC.

91.     As further alleged below, Defendants all participated in carrying out the common plan, design, and scheme and, as such, in addition to being personally liable for their own actions, Defendants are also jointly and severally liable for the actions of the other members of their respective chains of command as well as the other members of ACC, its successor, NACC, and COS, all of which were undertaken as part of the common plan, design, and scheme.

92.     The injuries alleged herein were inflicted deliberately and intentionally, under color of law, and under the apparent authority of the government of Venezuela.

    *i.*  *The Enforced Disappearance, Arbitrary Detention, Torture, and Extrajudicial Killing of Captain Rafael Acosta Arevalo.*

93.     On June 26, 2019, the Maduro regime announced that it had detained Arevalo, a former Captain in the FANB, and several other individuals accused of involvement in a coup plot it termed as "Vuelvan Caras." The following day, Attorney General Tarek William Saab made a televised statement that the Public Prosecutor's Office was opening an investigation into the alleged plot and accused fourteen individuals, including Arevalo.

94.     The investigation was assigned to the Thirty-Ninth National Prosecutor's Office. On that same day, Cabello, then president of the National Constituent Assembly, spoke about the alleged plot and the detention of Arevalo and the other accused on his television show, stating "they are in good protection of the authorities, providing declarations and adding to what must be added."

95.     According to a DGCIM report, on the morning of June 26, 2019, two DGCIM officers travelled from Caracas to Guaranas to arrest Arevalo based on intelligence information they had received.  At the time the report alleged he was detained, Arevalo's family had not seen or heard from him since June 21.

96.     At 7:00am on June 28, 2019, DGCIM officers brought Arevalo to the Carlos Arvelo Military Hospital, where a doctor certified that he had trauma to the thorax, nose, finger, and ankle, moderate dehydration, and a skin infection. That evening, Arevalo made an initial court appearance at the Third Military Court of Control on the Libertador Bolivarian municipality where he was charged with military crimes including treason to the homeland, military rebellion, and instigation to rebellion. Arevalo was unlawfully charged in a military court despite the fact that he was a civilian, having been discharged from the military in 2006.

97.     Arevalo was brought into the hearing in a wheelchair. Prior to the hearing, Arevalo and his lawyer had a brief interaction at which DGCIM officers insisted on being present. According to his lawyer, the first thing Arevalo did was request help, but he was unable to articulate basic words, could not move his hands or legs, and was bruised, bleeding, and barefoot. When asked if he had been tortured, Arevalo nodded. When the presiding judge saw Arevalo's condition, he ordered his immediate transfer to Vincente Salias Sanjora in Fort Tiuna.

98.     At around 9:00pm on June 28, 2019, DGCIM officers drove Arevalo from the courtroom to the hospital; a five-minute drive by car. According to a medical record, Arevalo reached the hospital with no vital signs. Between June 28 and June 29, 2019, no one, including his lawyer or his family members, was allowed access to the hospital per instructions from DGCIM officers.

99.     On June 28, 2019, an autopsy noted thirty-eight injuries, including a broken nasal septum, abrasions on his shoulders, elbows, and knees, and bruises all over his body. Arevalo's body also showed a fracture in one foot and signs of burns on his foot and wrist. His cause of death was severe cerebral edema from acute respiratory failure due to rhabdomyolysis caused by multiple traumatic injuries. His family requested an independent autopsy but received no response. Their requests for a Christian burial in their city of origin was also denied.

100.    Despite the circumstances of Arevalo's death and widespread reports of his mistreatment, a purported investigation resulted in only two low-level officials being charged with relatively minor offenses. No further investigation into allegations of torture ever occurred. As a

result, neither the senior members of COS, nor the conspirators within Venezuela's military, law enforcement, and judiciary who were ultimately responsible for ordering the unlawful detention, torture, and cruel, inhuman and degrading treatment which resulted in Arevalo's death were ever brought to justice.

101.    Arevalo's family reported his extrajudicial killing and torture to the United Nations Office of the High Commissioner for Human Rights as well as several authorities inside Venezuela. Thus, Perez has exhausted all remedies otherwise available to her to seek redress.

>    ii.    *The Enforced Disappearance, Arbitrary Detention, and Torture of First Lieutenant Luis Hernando Lugo Calderon.*

102.    Calderon was a resident and citizen of Venezuela and First Lieutenant in the Venezuelan Air Force. During his military service, Calderon joined other military officers in speaking out against the Maduro regime by calling for legal protests and peaceful civil disobedience on social media in connection with an effort called Operation Jerico.

103.    In February of 2015, following his pro-opposition public statements, Calderon was arrested along with eight other military officers identified during a special program broadcast on *Con Al Mazo Dando*. Calderon and his companions were falsely and maliciously accused of participating in a coup to violently overthrow the Maduro regime which Cabello termed *Golpe Azul*.

104.    Following the false accusations, Calderon was unlawfully arrested by a joint force comprised of DGCIM, Aragua state police, and SEBIN units. Calderon was then interrogated in the SEBIN-Aragua headquarters, under torture and other cruel and inhuman treatment, in an effort to compel him to falsely confess and implicate others.

105.    Calderon was handcuffed to a chair with outstretched arms for several hours. During his interrogation, his captors asked him what he knew of the opposition and for every question he did not answer the way they wanted they beat him. Calderon's captors also electrocuted him with a battery and two cables placed into his armpits each time he failed to respond the way his captors instructed. His interrogation was recorded with a video camera and used to support

Cabello's false narrative. Calderon was beaten so badly during his interrogation that his captors had to use only the audio from the recording, as the video would have shown the level of coercion applied. At times during the interrogation, DGCIM director Dala was present.

106.    Following his initial arrest and detention, Calderon was transferred to DGCIM Boleita in the City of Caracas where he was tortured and interrogated further and subjected to serious injury and other cruel, inhuman, and degrading treatment, including being denied food, and suffering permanent injuries to his sternum, knees, and one of his testicles.

107.    The injury to Calderon's sternum, for which his captors denied him treatment, became so severe that he nearly went into respiratory arrest. Calderon also suffered severe inflammation in one of his testicles that prevented him from walking. Eventually he was taken to a hospital, but when he returned to DGCIM headquarters, his captors did not comply with the treatment prescribed.

108.    Calderon appeared before Judge Pedro Lunar, a Navy Lieutenant with the Fifth Court of Control, who ignored his physical condition and the visible evidence of mistreatment by taking no action to stop or report it. Calderon's trial proceeded without any regard for his right to a fair trial before an impartial judge, or any of the customary procedural guarantees under Venezuelan law. Calderon was sentenced to nine years in Ramo Verde Prison.

109.    After serving three years and six months of his sentence, Calderon was awarded an appeal in which the judge reversed Calderon's initial conviction and remanded his case for a new trial. However, the new trial was removed from the docket a few days later by the military prosecutor general, Edgar Rojas Borges. During Calderon's second trial, seeing no other way out of the corrupt process in which he was caught, he accepted a plea agreement allowing him to be released on October 11, 2018. However, that same day, SEBIN and DGCIM agents raided the homes of his partner, his father, his mother, and his step-father, and placed his grandmother under house arrest.

110.    On October 14, 2018, DGCIM officers showed up at the apartment where Calderon was staying and beat him in front of his father and his partner, destroyed his apartment, and stole

his belongings. DGCIM officers also threatened to kill Calderon and his family. Following that encounter, they once again detained Calderon in DGCIM headquarters in Boleita.

111.    Following this second detention, Calderon remained imprisoned for 17 days, during which time he was not permitted to call a lawyer, he was largely deprived of food and water, and not permitted to contact his family. DGCIM officers also posted false reports to social media that Calderon had been killed with the intention of harming Calderon's family. Calderon experienced suicidal feelings at the thought of his family's pain and suffering.

112.    On November 14, 2018, Calderon was transferred to Ramo Verde prison for a second time, where he remained until he was released November 30, 2020, fleeing to the United States shortly thereafter.

113.    Calderon has, by counsel and through his family members, reported his torture and cruel, inhuman, and degrading treatment to the United Nations Office of the High Commissioner for Human Rights as well as several authorities inside Venezuela. Thus, Calderon has exhausted all remedies otherwise available to him to seek redress.

       *iii.*    *The Enforced Disappearance, Arbitrary Detention, and Torture of*
              *Captain Luis de la Sotta Quiroga.*

114.    On the morning of May 18, 2018, Quiroga, a Captain in the Venezuelan Navy, was at his place of work when his supervisor informed him that a commission from DGCIM would be arriving from Caracas to question him. Later that day, eight men in black DGCIM uniforms arrived by helicopter, carrying firearms. They threatened Quiroga with their weapons, forcing him into the helicopter, without presenting an arrest warrant, and took him to DGCIM Boleita, Caracas.

115.    While detained at DGCIM Boleita, Quiroga was questioned regarding Operation Armageddon, the alleged coup in which he was falsely accused of participating. He was not allowed to contact his family or a lawyer to inform them of his arrest and whereabouts.

116.    On May 19, 2018, DGCIM sent the Military Prosecutor's Office a communication, signed by the DGCIM Director of Investigations, Rafael Antonio Quintero, transmitting an intelligence report from May 16, 2018. DGCIM's intelligence report falsely

claimed Quiroga was involved in Operation Armageddon and asked that the office open a criminal investigation.

117.     On May 20, 2018, Major Claudia Perez de Mogollon, a judge of the First Military Court of Control, issued an arrest warrant against Quiroga, despite the fact that he had been unlawfully detained without a warrant two days earlier.

118.     From May 18 to May 21 of 2018, Quiroga was detained at DGCIM headquarters and no official information was revealed about his whereabouts. During that time, Quiroga was locked in a 2x2 meter room and interrogated while handcuffed, blindfolded, and hooded. Four DGCIM officers beat him with sticks and suffocated him with a plastic bag filled with tear gas. He was also deprived of food and access to the bathroom.

119.     During the night of May 20, 2018, DGCIM officers removed Quiroga's hood and cuffed his hands in front of him as opposed to behind the back, read him his rights, and made him sign a certificate stating that he had just been detained. He told family members that DGCIM officers had attempted to induce a confession that he had been involved in planning a *coup d'état*. The following day, a government doctor examined Quiroga and reported that he did not have any injuries, despite visible signs of torture at the time of evaluation.

120.     On May 22, 2018, four days after his detention, DGCIM officers presented Quiroga and seven other individuals before a judge at the First Military Court of Control in Caracas. Captain Quiroga requested a defense lawyer of his choosing, but the Court refused and appointed a military public defender. He appeared in court in the same clothing he had been wearing when arrested and it was stained with blood. Quiroga pointed to the marks on his hands from the tight handcuffs and told the court "I was tortured, abused, and suffocated by DGCIM officers" and declared he was innocent of the charges against him. A medical examination was requested, but neither the prosecutor nor the judge responded to the torture allegations. Instead, the court ordered him back to DGCIM Boleita for pre-trial detention.

121.     During pretrial detention, Quiroga spent 33 days incommunicado in a room known as the Crazy Room (*el Cuarto de los Locos*). During his solitary confinement, Quiroga was not

allowed to use the bathroom and slept in his own waste. He was beaten, suffocated with a plastic bag, and DGCIM officers made threats against his family.

122.   On June 23, 2018, Quiroga was permitted a family visit. According to family members who saw him that day, Quiroga's head had been shaved, he was wearing clothes that smelled bad, and he could not stand up straight because his ribs were broken. He was pale, thin, and had scars on his wrists. He appeared disoriented, did not know what time it was, and was desperate to know where his children were.

123.   The preliminary hearing in Quiroga's case was held from December 12 to December 20, 2018, seven months after the initial appearance, in violation of Venezuelan law requiring a hearing to be held within 65 days. At the preliminary hearing, the only evidence presented was the statement made by a lieutenant who was detained during the same operation. At that preliminary hearing, Quiroga reiterated that he was victim of torture, named a "Major Hurtado" as one who had tortured him, and said he feared for his life at DGCIM.

124.   After one month, Quiroga was transferred to another cell in Basement 1, also within the DGCIM Boleita building where Dala, Figuera, and Quintero maintained their offices. He remained there from June 2018 to January 2020. After the initial appearance, Quiroga requested to be transferred away from DGCIM Boleita but the judge refused.

125.   In October 2018, the Inter-American Commission on Human Rights issued precautionary measures in favor of Quiroga, urging Venezuela to guarantee him access to necessary pharmacological care. On repeated occasions, Quiroga's family and his legal counsel submitted complaints on his conditions of detention to no avail. Because Quiroga holds joint Venezuelan and Peruvian citizenship, the Peruvian embassy also made numerous requests on his behalf to allow him access to consular protection. At the time of this filing, Quiroga was recently released after an unlawful detention under conditions constituting torture which lasted longer than five years and, during that time, he exhausted all remedies otherwise available to him.

> vi.    *The Enforced Disappearance, Arbitrary Detention, and Torture of Lieutenant Eduardo Figeroa Marchena.*

126.    Marchena was a lieutenant in the Venezuelan Air Force until 2011 when he separated, in part due to his perceived lack of loyalty to the Maduro regime.

127.    In 2014, Marchena started a website through which he organized peaceful dialogues with like-minded individuals seeking solutions to Venezuela's worsening human rights crisis.

128.    On February 12, 2015, Cabello publicly accused Marchena on *Con Al Mazo Dando* of conspiring to overthrow the Maduro regime by using Tucano aircraft to attack government buildings. The only evidence Cabello cited in support of these allegations was an audio recording of an allegation against Marchena by Calderon which was, itself, coerced through torture.

129.    Because of the accusations made by Cabello, Marchena's residence was subjected to repeated raids and kidnapping attempts which, though initially unsuccessful, nonetheless forced Marchena to flee Venezuela to Panama. While in Panama, Marchena was kidnapped by Maduro allies among Panama's national police, where he was subject to torture and other cruel, inhuman, and degrading treatment, and isolated for two days before being returned to Venezuela.

130.    After his return to Venezuela, Marchena was personally threatened by the then Minister of the Interior and Justice, Gustavo Gonzales Lopez, who threatened him with disappearance if he did not cooperate. Thereafter, Marchena was imprisoned for fifteen months in the basement of DGCIM Boleita, where he was further subjected to torture and other cruel, inhuman, and degrading treatment, including deprivation of food and light, asphyxiation, and beatings.

131.    Following this torture, Marchena was transferred to Ramo Verde prison where he served a sentence of three years and nine months. During this time, Marchena was subjected to further torture and other cruel, inhuman, and degrading treatment at the hands of Colonel Franco Quintero, which was intended to punish him for his perceived opposition to the Maduro regime. Upon his release, the presiding judge required that Marchena leave the country and not make any statements to the media.

132.     Marchena has since fled to Spain and has, himself or through counsel and his family members, reported his torture and cruel, inhuman, and degrading treatment to the United Nations Human Rights Commission as well as several authorities inside Venezuela. Thus, Marchena has exhausted all remedies otherwise available to him to seek redress.

## VII.   CAUSES OF ACTION

### COUNT I: TORTURE & EXTRAJUDICIAL KILLING
(TVPA: Defendants Maduro, Padrino Lopez, Moreno, Torres, and Figuera)

133.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

134.     These claims are brought pursuant to the TVPA by Calderon, Quiroga, Marchena, and Perez, in her capacity as the personal representative for the Estate of Arevalo.

135.     The harms to Calderon, Quiroga, Marchena, and Arevalo described herein were inflicted by and at the instigation of a public official and/or other person acting in an official capacity under color of law.

136.     Defendants personally participated in the scheme to illegally detain and inflict severe pain and suffering on Calderon, Quiroga, Marchena, and Arevalo.  Defendants procured, counseled, aided, abetted and assisted others in effecting the common plan, design, and scheme specifically intended to inflict severe pain and suffering for the purposes of procuring coerced confessions to discredit opposition to the Maduro regime and enable Defendants to maintain control over the COS Criminal Enterprise—and the illicit revenue streams derived therefrom—which they required to maintain their unlawful control over Venezuela.

137.     From on or about June 22, 2019, until the time of his death, Arevalo was in the custody and/or physical control of Defendants through DGCIM officers acting on their behalf. Several government officials, acting with authority they only had by virtue of their government office, acknowledged that an investigation was opened which resulted in Arevalo's unlawful arrest and detention.

138.     From on or about May 18, 2018, until September 29, 2023 (1,960 days), Quiroga

was in the custody and/or physical control of Defendants, through DGCIM officers acting on their behalf. Several government officials, acting with authority they only had by virtue of their government office, acknowledged that an investigation was opened which resulted in Quiroga's unlawful arrest and detention.

139.   From on or about February 11, 2015, to November 30, 2020 (2,119 days), Calderon was in the custody and/or physical control of Defendants and the DGCIM officers acting on their behalf. Several government officials, acting with authority they only had by virtue of their government office, acknowledged that an investigation was opened which resulted in Calderon's unlawful arrest and detention.

140.   From on or about June 1, 2015, to March 27, 2019 (1,395 days), Marchena was in the custody and/or physical control of Defendants and the DGCIM officers acting on their behalf. Several government officials, acting with authority they only had by virtue of their government office, acknowledged that an investigation was opened which resulted in Marchena's unlawful arrest and detention.

141.   The harms described herein were inflicted deliberately and intentionally for one or more of the following purposes:  to punish Calderon, Quiroga, Marchena, and Arevalo for an act they were claimed to have committed, namely participation in an alleged coup; to intimidate and/or coerce Calderon, Quiroga, Marchena, Arevalo, and other third persons into refraining from taking actions in opposition to the Maduro regime; and/or to discriminate against them due to their perceived political opposition.

142.   The harms described herein were inflicted by and at the instigation of a public official, or other person acting in an official capacity, including the DGCIM officers acting in their official capacity under orders from Defendants and their co-conspirators and at the instigation of Tarek William Saab and Diosdado Cabello; both of whom acknowledged with favor the unlawful arrest and detention of Calderon, Quiroga, Marchena, and Arevalo on national television.

143.   The acts described herein—including, but not limited to, the act of torturing and beating Arevalo so severely that he suffered a broken nasal septum, abrasions on his shoulders,

elbows, and knees, and bruises all over his body, a fracture in one foot and signs of burns on his foot and wrist, and ultimately causing rhabdomyolysis from his multiple traumatic injuries while he was still alive—constituted cruel, inhuman or degrading treatment or punishment of Arevalo.

144.    The acts described herein—including, but not limited to, the act of locking Quiroga in a 2x2 meter room and interrogating him while handcuffed, blindfolded, and hooded, beating him with sticks, suffocating him with a plastic bag filled with tear gas, depriving him of food, access to the bathroom, and necessary medications, and denying him access to his family and his legal counsel for more than 30 days—constituted cruel, inhuman or degrading treatment or punishment of Quiroga.

145.    The acts described herein—including, but not limited to, beating him with a bat, electrocuting him with a battery and two cables placed into his armpits, using his coerced confession to support a false narrative of an alleged coup, subjecting him to serious injury to the sternum, knees, and testicle, and denying him food, water, and medical treatment—constituted cruel, inhuman or degrading treatment or punishment of Calderon.

146.    The acts described herein—including, but not limited to the deprivation of food and light, asphyxiation, and beatings—constituted cruel, inhuman or degrading treatment or punishment of Marchena.

147.    The pain or suffering described herein did not arise from and was not incidental to any lawful sanctions.

148.    The acts described herein constitute torture under the TVPA and Plaintiffs are entitled to damages as a result.

149.    Defendants also participated in the extrajudicial killing of Arevalo, as joint tortfeasors, co-conspirators, and participants in a common plan, design and scheme. Defendants procured, counseled, directed, aided, abetted, and assisted agents of DGCIM and SEBIN in effecting the common plan, design, and scheme of the NACC that resulted in the death of Arevalo to the benefit of the COS.

150.    The extrajudicial killing of Arevalo was not authorized by any court judgment and

was unlawful under the laws of Venezuela that existed at that time. Arevalo was never lawfully convicted of nor sentenced for any crime.

151. Plaintiffs have exhausted all adequate and available remedies to address these acts of torture and extrajudicial killing within Venezuela.

152. The acts and omissions alleged herein were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### COUNT II: VIOLATIONS OF THE LAW OF NATIONS
(28 U.S.C. § 1350: All Defendants)

153. Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

154. Plaintiffs, at all times relevant to this case, were and are non-U.S. nationals.

155. Defendants personally participated in the scheme to illegally detain and inflict severe pain and suffering on Calderon, Quiroga, Marchena, and Arevalo. Defendants procured, counseled, aided, abetted, and assisted others in effecting the common plan, design, and scheme specifically intended to illegally detain and inflict severe pain and suffering on Calderon, Quiroga, Marchena, and Arevalo for the purpose of intimidating and/or coercing these men and other third persons to refrain from acting in opposition to the Maduro regime.

156. The wrongful acts described above constitute torture, as well as cruel, inhuman, or degrading treatment or punishment, in violation of Article 7 of the International Covenant on Civil and Political Rights and in violation of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. These acts also violated treaties of the United States and customary international law, as codified in relevant provisions of the international agreements and declarations listed in paragraphs 15 and 16 herein.

157. Consequently, the torture of Calderon, Quiroga, Marchena, and Arevalo is actionable under 28 U.S.C. § 1350.

158. The act of extrajudicial killing of Arevalo violated Article 6 of the International

Covenant on Civil and Political Rights.  It also violated customary international law, as codified in relevant provisions of the international agreements and declarations listed herein.

159.    Consequently, the extrajudicial killing of Arevalo is actionable under 28 U.S.C. § 1350.

160.    The acts of extrajudicial killing, torture, and other inhuman acts alleged herein constitute crimes against humanity.  These acts were committed in a systematic manner and on a large scale; they were instigated and/or directed by the government of Venezuela, and carried out by Defendants against a civilian population.

161.    The crimes against humanity alleged herein are actionable under 28 U.S.C. § 1350 because they were carried out in violation of customary international law, as codified in relevant provisions of the international agreements and declarations listed herein.

162.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## COUNT III: CONSPIRACY TO VIOLATE FEDERAL CIVIL RICO
**(**18 U.S.C. § 1964(c); All Defendants**)**

163.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

164.    Title 18, Section 1962(c) of the United States Code makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

165.    Each named defendant to this action is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. §1961(3).

166.    FARC, COS, and the Maduro regime form an association in fact for the common and continuing purpose described herein, including, for instance, for the purpose of maintaining unchallenged authoritarian control over Venezuela, furthering the COS Criminal Enterprise, and

engaging in: (a) narcotics trafficking; (b) acts of terrorism, including, but not limited to, narco-terrorism; (c) human rights violations including kidnapping, torture, and murder; (d) public corruption offenses; and (e) money laundering. The COS Criminal Enterprise constitutes an "enterprise," within the meaning of 18 U.S.C. §1961(4), engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of this enterprise function with several ascertainable structures separate and distinct from that of the conduct of the pattern of racketeering activity.

167.    The Maduro regime, through its control over the COS Criminal Enterprise, operates a vast criminal network intended to escape the sanctions placed upon it by the United States and others as a counter to the Maduro regime's continued unlawful control over Venezuela and the violent terrorist activities it supports and engages in to maintain it. But for the narcotics trafficking activities and money laundering the conspiracy continually caries out in the State of Florida, its acts of terrorism and human rights violations, including kidnapping, torture, and murder, in Venezuela would not be possible.

168.    The Maduro regime and the COS Criminal Enterprise have engaged in, and their activities have affected interstate and foreign commerce.

169.    Defendants, each of whom are persons associated with or employed by the Maduro regime, the COS Criminal Enterprise, or FARC, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(1), 18 U.S.C. §1961(5), and 18 U.S.C. §1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities, organs, powers, and services of the Maduro regime and the COS Criminal Enterprise. Defendants each had the specific intent to engage in the substantive RICO violation alleged herein.

170.    Defendants each committed at least two predicate acts of racketeering activity that are indictable under provisions of the U.S. code enumerated in 18 U.S.C. §1961(1), as more specifically alleged below.

171.    In violation of 18 U.S.C. § 1962(d), Defendants each knowingly, willfully, and

unlawfully conspired to facilitate a scheme which included the operation and/or management of a RICO enterprise through the pattern of racketeering activities alleged herein.

172.    The participation of Defendants in this conspiracy began no later than 2009 and is ongoing to this day.

173.    This ultimate purpose of the conspiracy is to maintain Defendants' unlawful exercise of authoritarian control over the organs of the Venezuelan government and, through it, control over the COS Criminal Enterprise, its narcotics trafficking activities, and the illicit revenue streams derived therefrom. Without these illicit revenue streams, substantial portions of which have been laundered through the State of Florida, the conspiracy, which relies upon the distribution of criminal patronage to maintain the support of its loyalists, would cease to function.

174.    That purpose is carried out by a conspiracy to engage in the following predicate acts under 18 U.S.C. §1961: (a) kidnapping, arbitrary detention, torture, extrajudicial killing, murder, and bribery, narcoterrorism and other acts of international terrorism, as defined by 18 U.S.C. §1503, against the citizens of either Venezuela or the United States designed to intimidate and coerce the citizens of either country; (b) narcotics trafficking (21 U.S.C § 841(a)); (c) public corruption offenses, such as bribery (18 U.S.C. § 201) and/or obstruction of justice 18 U.S.C. § 1503); and (d) money laundering (18 U.S.C. § 1856).

175.    Each Defendant committed no fewer than one overt act in furtherance of the conspiracy alleged herein. These acts included, but are not limited to, acts supporting the illegal detention and torture of Calderon, Quiroga, Marchena, and Arevalo, the extrajudicial killing of Arevalo, and the drug trafficking operations intended to fund the illegal acts of the conspiracy.

176.    To the extent any of the Defendants did not specifically agree to harm one or more of Calderon, Quiroga, Marchena, and Arevalo, the explicit purpose of the acts they engaged in was the further the overall object of the conspiracy, and the illegal detention and torture of Calderon, Quiroga, Marchena, and Arevalo was in furtherance of that same conspiracy.

177.    Defendants' violations of federal law as set forth herein, each of which directly and proximately caused damages to Plaintiffs, constituted a continuing course of conduct spanning

from at least 2009 to the present, which was intended to obtain money through narcoterrorism, narcotics trafficking, and other unlawful means and, thus, constituted a pattern of racketeering activity under 18 U.S.C §1961(1) and (5).

178.    Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the Maduro regime and the COS Criminal Enterprise through a pattern of racketeering activity in violation of 18 U.S.C §1962(c).

179.    By these actions alleged herein, Calderon, Quiroga, Marchena, and Arevalo were directly injured in their business and property, including, but not limited to, the loss of business revenue or employment income, costs of family relocation, immigration expenses, and the loss of value in both real and personal property. Defendants are thereby liable for all such injuries (including treble damages), plus reasonable attorneys' fees and costs.

### COUNT IV: ARBITRARY DETENTION, TORTURE, AND WRONGFUL DEATH
**(**Venezuelan Law; All Defendants**)**

180.    Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

181.    Venezuelan law, specifically the Special Law to Prevent and Punish Torture and Other Cruel, Inhuman or Degrading Treatment (*Ley Especial Para Previnir Y Sancionar La Tortura y otros Tratos Crueles Inhumanos o Degradantes*) (the "Special Law"), prohibits the acts of torture, cruelty, and inhuman treatment alleged herein. Calderon, Quiroga, Marchena, and Arevalo were arbitrarily detained, without cause or due process, and also physically and physically and mentally tortured in violation of the Special Law.

182.    Under Venezuelan law, Plaintiffs have a civil cause of action against those who injured as a result of actions taken in violation of the Special Law.

183.    These acts of torture and cruel treatment are also in violation of—or done in furtherance of a conspiracy to violate—several other Venezuelan statutes for which there is civil liability under Venezuelan law, specifically the following provisions of the Venezuelan Criminal Code: Article 176 (prohibits arbitrary deprivation of liberty by public officials); Article 180 A

(which prohibits any person in the service of the state from refusing to acknowledge the arrest or give information about disappeared persons); Article 374 (prohibiting rape or threat of rape to a person in custody of the accused); Article 460 (prohibiting kidnapping and coercion or extortion or conspiracy to commit the same); and Article 405 (which prohibits homicide and assassination).

184.    Moreover, Article 23 of the Venezuelan Constitution states: "The treaties, pacts and conventions relating human rights which have been executed and ratified by Venezuela have a constitutional rank, and prevail over internal legislation, insofar as they contain provisions concerning the enjoyment and exercise of such rights that are more favorable than those established by this Constitution and the laws of the Republic, and shall be immediately and directly applied by the courts and other organs of the Public Power."

185.    Venezuela is a signatory to the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, among other international human rights treaties and conventions. As such, to whatever extent those treaties or conventions are more favorable to Plaintiffs than domestic Venezuelan law, those more favorable provisions should be applied pursuant to Article 23 of the Venezuelan Constitution.

186.    Defendants' violations of Venezuelan law, as alleged and set forth herein, directly and proximately caused damages to Plaintiffs, including personal injuries, emotional distress, economic loss, and the death of Arevalo.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award damages to Plaintiffs against Defendants Maduro, Padrino Lopez, Moreno, Torres, and Figuera on Count I, and all Defendants as to all other Counts, jointly and severally, and grant Plaintiffs:

To Perez, in her capacity as personal representative of the Estate of Arevalo, the following:

    a.  Compensatory damages for the unlawful detention, torture, and death of Arevalo, including pain and suffering, emotional distress, loss of advice, solace, counsel, and companionship, economic damages, and injuries to business and property, in the

amount of $50,000,000.00 or a sum certain to be determined at trial;

    b.  Punitive or treble damages in the amount of three times the compensatory judgment awarded, as warranted by the law and the facts;

    c.  Prejudgment interest, from June 22, 2019 until the date of judgment;

    d.  Post-judgment interest as calculated at the maximum rate allowable by law;

    e.  Injunctive relief necessary to avoid liquidation or transfer of assets; and

    f.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To Quiroga, the following:

    a.  Compensatory damages for the unlawful detention and torture of Quiroga, including pain and suffering, emotional distress, economic damages, and injuries to business and property, in the amount of $50,000,000.00 or a sum certain to be determined at trial;

    b.  Punitive or treble damages in the amount of three times the compensatory judgment awarded, as warranted by the law and the facts;

    c.  Prejudgment interest, from May 18, 2018 until the date of judgment;

    d.  Post-judgment interest as calculated at the maximum rate allowable by law;

    e.  Injunctive relief necessary to avoid liquidation or transfer of assets; and

    f.  Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To Calderon, the following:

    a.  Compensatory damages for the unlawful detention and torture of Calderon, including pain and suffering, emotional distress, economic damages, and injuries to business and property, in the amount of $50,000,000.00, or a sum certain to be determined at trial;

    b.  Punitive or treble damages in the amount of three times the compensatory judgment awarded, as warranted by the law and the facts;

    c.  Prejudgment interest, from February 11, 2015 until the date of judgment;

    d.  Post-judgment interest as calculated at the maximum rate allowable by law;

e.   Injunctive relief necessary to avoid liquidation or transfer of assets; and

f.   Such other and further relief as the Court may determine to be just and equitable under the circumstances.

To Marchena, the following:

a.   Compensatory damages for the unlawful detention and torture of Marchena, including pain and suffering, emotional distress, economic damages, and injuries to business and property, in the amount of $50,000,000.00, or a sum certain to be determined at trial;

b.   Punitive damages or treble in the amount of three times the compensatory judgment awarded, as warranted by the law and the facts;

c.   Prejudgment interest, from June 1, 2015 until the date of judgment;

d.   Post-judgment interest as calculated at the maximum rate allowable by law;

e.   Injunctive relief necessary to avoid liquidation or transfer of assets; and

f.   Such other and further relief as the Court may determine to be just and equitable under the circumstances.

A jury trial is demanded on all issues.

Dated: September 27, 2024

**STUMPHAUZER KOLAYA
NADLER & SLOMAN PLLC**
2 S. Biscayne Blvd., Suite 1600
Miami, Florida 33131
Tel.: (305) 614-1400
Fax: (305) 614-1425

By: */s/ Michael B. Nadler*
Michael B. Nadler (FBN: 51264)
Francis D. Murray (FBN: 108567)
Email: mnadler@sknlaw.com
         fmurray@sknlaw.com

**THOMPSON LAW GROUP**
600 Barrett Street
Virginia Beach, VA 23452
Tel.: (757) 486-3333

Jeff S. Howell, Jr.*
VA Bar No. 87645
Email: jeff@tlgva.com

Respectfully submitted,

**SINGER HOFFMAN, LLC**
1209A Laskin Road
Virginia Beach, VA 23451
Tel.: (757) 301-9995
Fax: (757) 233-1084

Randy D. Singer*
VA Bar No. 26501
Email: randy.singer@singerhoffman.com

Kevin A. Hoffman*
VA Bar No. 87632
Email: kevin.hoffman@singerhoffman.com

*\*pro hac vice* motion pending

*Counsel for Plaintiffs*

45